Filed 1/9/26  P. v. Kirk CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ROY MICHAEL KIRK,<br><br>    Defendant and Appellant. | F088131<br><br>(Super. Ct. No. MF012675A)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  John W. Lua, Judge.

Solomon Wollack, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Eric L. Christoffersen and John Merritt, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant and appellant Roy Michael Kirk was convicted of four counts of a lewd or lascivious act on a child under 14 years of age (Pen. Code,[1] § 288, subd. (a)) for molesting four girls. The jury also found true the allegation defendant committed the offenses against multiple victims (§ 667.61, subd. (e)(4)). Defendant was sentenced to 100 years to life comprised of four consecutive terms of 25 years to life pursuant to section 667.61, subdivision (j)(2), a provision of the One Strike law (§ 667.61 et seq.).

On appeal, defendant contends: (1) the prosecutor committed prejudicial misconduct during her rebuttal argument; (2) the 25 years to life sentences on three counts violate constitutional prohibitions on ex post facto laws because the offenses occurred prior to the effective date of the statute under which they were imposed (§ 667.61, subd. (j)(2)); and (3) the trial court violated defendant's due process rights by allowing the prosecutor to amend the information at the close of evidence to add the allegation that triggered a sentence of 25 years to life.

The Attorney General agrees the evidence does not establish the offenses for three counts occurred after section 667.61, subdivision (j)(2) took effect, and defendant's sentence on those counts must be reversed. The Attorney General otherwise refutes defendant's claims of error and argues the judgment should be affirmed.

We reject defendant's prosecutorial misconduct claim and challenge to the information's amendment. We agree with the parties however that sentencing under section 667.61, subdivision (j)(2) on counts 2, 3, and 4 violated ex post facto laws. We will therefore modify the judgment to impose the mandatory sentence on those counts under the applicable law. As modified, we affirm.

## PROCEDURAL SUMMARY

On February 6, 2018, the Kern County District Attorney filed an information charging defendant with three counts of committing a lewd or lascivious act on a child

---

[1] Undesignated statutory references are to the Penal Code.

under 14 years of age (§ 288, subd. (a)) against three victims: I.C., J.R., and T.K. The information further alleged defendant had committed qualifying sex offenses against multiple victims under the One Strike law (§ 667.61, subds. (c), (e)(4), former subd. (e)(5)). On March 17, 2022, the Kern County District Attorney filed a separate information charging defendant with one count of continuous sexual abuse of a child (§ 288.5, subd. (a)) against K.M. The two cases were consolidated on the prosecution's motion with the latter count becoming count 4. The amended information filed on April 12, 2022, included all four counts and the multiple victim circumstance on all counts.

On April 16, 2024, the prosecution amended the information again to allege the following aggravating factors on all four counts: the victim was particularly vulnerable (Cal. Rules of Court,[2] rule 4.421(a)(3)); the manner in which the crime was carried out indicated planning, sophistication, or professionalism (rule 4.421(a)(8)); and the defendant took advantage of a position of trust or confidence to commit the offense (rule 4.421(a)(11)). Trial on the aggravated factors was bifurcated.

The case was tried before a jury in April 2024. After the close of evidence, the prosecution orally moved to amend the information to: (1) change the continuous sexual abuse count (§ 288.5, subd. (a); count 4) to a fourth count of committing a lewd or lascivious act on a child under 14 years of age (§ 288, subd. (a)); and (2) allege a multiple victim enhancement under the One Strike law on all four counts to seek a sentence of 25 years to life on each count (§ 667.61, subds. (e), (j)(2)). Defendant did not object to the former amendment but objected to the latter. The prosecutor filed a written information reflecting these amendments on April 24, 2024.

On April 24, 2024, the jury found defendant guilty on all counts and found true the multiple victim circumstance on all counts. In a bifurcated bench trial, the trial court found true the following aggravating factors: rule 4.421(a)(3) on all counts, and rules

---

[2]     All further rule references are to the California Rules of Court.

4.421(a)(8) and (a)(11) on counts 1, 3 and 4.

On June 3, 2024, the trial court sentenced defendant to 100 years to life comprised of four consecutive terms of 25 years to life, one for each count.

Defendant filed a timely notice of appeal.

## FACTUAL SUMMARY

### I. Prosecution Evidence

#### A. I.C. (Count 1)

I.C. was born in June 2006, and lived in Tehachapi with her father, J.C., and her stepmother, S.C. Defendant and J.C. were friends as both were disc jockeys. Defendant lived down the street and regularly came over to I.C.'s house.

Defendant touched I.C. in a way she "did not like" at her house when she was five or six years old. He touched her vagina and chest a few times both over and under her clothes and touched her butt once over her clothes. The touching sometimes happened in I.C.'s bedroom and sometimes outside the house. Defendant would ask I.C. if she liked it when he touched her.

Defendant first touched I.C. when she was five years old. He touched her chest over and under her clothes. Another time, defendant pulled I.C. to the side of her backyard while her parents were barbecuing. He unzipped his pants and told her to suck his penis. Defendant offered to give I.C. a drink if she would touch and suck his penis. He got angry when I.C. said no and grabbed her arm as she tried to walk away. I.C. did not touch or put her mouth on defendant's penis and ran away.

One time, defendant told J.C. he was going to the bathroom but instead went into I.C.'s bedroom as she was going to bed. He asked I.C. if she wanted to play, and she said no. Defendant took I.C.'s covers off, unzipped her pajamas, and pulled her underwear halfway down. He touched I.C.'s chest under her pajamas. Defendant put his fingers inside her vagina. He stopped touching I.C. when J.C. called defendant. I.C. zipped her clothes back up and tried to go to sleep.

4.

Another time, I.C. was playing with her toys on her bedroom floor. Defendant came into her room, kneeled while putting his hand on I.C.'s back, and started to slide his hand down over her clothes toward her butt. I.C. ran away before he reached her butt.

Defendant showed I.C. videos of his birds in front of S.C., but showed her other videos when S.C. was not looking. He showed her a pornographic video of two naked girls licking each other. Defendant also showed I.C. a video of him masturbating to ejaculation, then rubbing his semen on his stomach. Defendant was shown licking a girl's vagina in another video shown to I.C.

I.C. and her parents went to defendant's house for dinner once. Defendant, I.C.'s parents, and another adult were sitting at the table talking when defendant hinted with his eyes to I.C. to look under the table. She lifted the tablecloth to look under the table and saw defendant touching his penis.

J.C. stopped hanging out with defendant after hearing a rumor that defendant had possibly molested a little girl in town. The touching incidents with I.C. stopped when defendant stopped coming over. I.C. initially did not tell anyone about defendant touching her because he threatened to hurt her family if she ever told anyone. She was afraid to tell her father because she thought he may be so upset he would hurt defendant. I.C. later told her godmother.

On November 2, 2016, when she was 10 years old, I.C. reported defendant's touching to a teacher's aide at her school. I.C. told the aide that defendant was still periodically touching her inappropriately. I.C. said he did not touch her as much anymore because defendant likes younger girls. I.C. also told the aide that she would give defendant a teddy bear with panties on so he would not touch her. The school's principal called the police after I.C.'s report to the aide.

On November 4, 2016, Tehachapi Police Officer Alejandro Barajas responded to I.C.'s school in response to her report to the teacher's aide. I.C. described to Barajas

defendant's touching and the videos he had shown her. She had trouble with dates and times while disclosing to Barajas.

Barajas interviewed I.C.'s parents, J.C. and S.C., together at their house after speaking with I.C. I.C.'s parents did not believe I.C.'s accusations against defendant. They told Barajas that I.C. lies a lot and were skeptical of her story because they had watched a Law & Order episode with a plot similar to her accusations. J.C. also did not believe I.C. because her story kept changing. S.C. did not believe defendant had the opportunity to be alone with I.C. She told Barajas details I.C. described about the bed and blanket must have been wrong. S.C. thought I.C. was making the story up to get attention because she overhead that S.C.'s eldest daughter had been molested by S.C.'s ex-husband.

During a forensic interview, I.C. provided more details than when she spoke with Barajas and there were inconsistencies between the two disclosures. She drew a picture of the side of her house where defendant asked her to "lick his private area" as she called it. I.C. also discussed the videos defendant showed her and the incident when defendant touched himself under the table.

### B. J.R. (Count 2)

J.R. was born in January 2000, and was about nine years old in 2009. That year, she had a sleepover at her friend K.M.'s house. K.M.'s mother, T.M., was dating defendant at the time.

On the night of the sleepover, defendant and J.R. were alone in T.M.'s living room watching a movie. Defendant sat next to J.R. and asked if she wanted to play a game. He began caressing the side of J.R.'s breast, first outside her shirt then under. Defendant then started caressing her thighs near her vagina under her pants. He went back and forth between touching her chest and legs. Defendant did not touch J.R.'s vagina but touched close to it. J.R. was scared and uncomfortable and ultimately got up and walked away. Defendant told her if she told anybody then they could not play like that again. J.R. went

6.

to K.M.'s room, woke up K.M. and K.M.'s sister, and asked if she could use the phone because she felt uncomfortable and wanted to go home.

T.M. testified J.R., defendant, and her son were watching a movie in the living room that night. She went to her room but occasionally came out and checked on everyone. Her son was sleeping while J.R. and defendant watched the movie. T.M. guessed defendant came to bed around midnight.

J.R. told her mother, L.C., what happened when she got home. L.C. called the police. Tehachapi Police Officer Peter Graff came to the house and spoke with J.R. and L.C. shortly after. Defendant was not pursued by the police at that time. J.R. did not return to K.M.'s house again after that. J.R. saw defendant following her in his car around town around 10 times. J.R. believed L.C. obtained a restraining order against defendant, but L.C. denied doing so.

### C. T.K. (Count 3)

T.K., born in August 1998, lived with her mother, K.J., and her stepfather, M.P., while growing up in Tehachapi and Bakersfield. Defendant was best friends with K.J. and came over to T.K.'s house often. He also lived in the house with the family for a short period. T.K. understood she was to treat defendant like family.

Defendant touched T.K. inappropriately several times before she was 14 years old. He started by using a massage gun to massage T.K.'s whole body including her inner thigh near her vaginal area, but he later used his hands to touch her. Defendant touched the lips of T.K.'s vagina (but no penetration), her breasts, and her butt with his hands. This touching was both over and under her clothes. He only touched T.K. when they were alone together and did so in several places at T.K.'s house and his own house. T.K.'s bedroom door was open while defendant touched her in her bedroom. T.K. would sometimes get up and walk away during defendant's touching though she never asked him to stop.

T.K. began dressing differently to be clothed with no skin showing when defendant was coming over. She avoided him by going into another room or locking herself in a room, but K.J. would tell T.K. to stop excluding herself from the family. Defendant would touch T.K.'s back or just above her butt in front of other people in a way that seemed casual, but T.K. did not like.

M.P. saw defendant do something he found inappropriate with T.K. when she was about seven years old. M.P., defendant, and T.K. were swimming in the pool when M.P. got out to go to the store with K.J. M.P. was going through the garage and turned around because he forgot something. He saw T.K. straddled around defendant in the pool. M.P. told K.J. he did not think that was appropriate, but K.J. told him not to mention it again.

At some point, T.K. told M.P. what defendant was doing and M.P. told K.J., but K.J. did not believe T.K. M.P. testified T.K. never expressed concerns to him about defendant. He said if T.K. had told him that defendant was touching her private areas he would have been on it "like white on rice."

T.K. was friends with K.M., T.M.'s daughter. During senior year of high school, T.K. asked K.M. if she had similar experiences with defendant, but K.M. said no.

T.K. did not disclose what happened with defendant to the police until they contacted her in 2017. When she was probably five years old, T.K. had disclosed to the police her molestation by a different person who confessed and was convicted.

### D. K.M. (Count 4)

K.M. was born in November 1998. As previously stated, K.M.'s mother, T.M., was defendant's girlfriend. They started dating when K.M. was six or seven years old and stopped when she was 11 years old. While they were dating, defendant lived in K.M.'s house with K.M.'s two siblings and at times, defendant's daughter.

At first, defendant played games with K.M. like "purple nurple" where he would grab her nipples with his fingers and pants her throughout the house. Defendant would laugh when K.M. sometimes told him to stop. This escalated to defendant touching

8.

K.M.'s vagina and breasts over and under her clothes. The touching occurred over several years and hundreds of times. K.M. was told almost every day she would get in trouble if she talked to anyone about it. Her siblings were sometimes in the house when defendant touched K.M., but did not see it happen. T.M. was not at the house when this touching occurred and was usually out running errands.

One time, defendant was in T.M.'s bed and put K.M.'s hand on his penis under his pants. K.M. immediately took her hand out. No one else was in the room when this happened.

Defendant treated K.M. differently than her siblings by giving her gifts. As a child, she did not wonder why she was getting gifts while her siblings were not, but looking back on it as an adult, K.M. thinks it was because she was being touched.

When T.M. was living with defendant, she did not see anything that caused her to be concerned about the way defendant acted around K.M. or other young girls. After the 2009 incident with J.R., T.M. asked K.M. if defendant had ever touched her inappropriately and K.M. said no.

K.M. and T.K. were close friends growing up. K.M. remembered T.K. telling her in high school that defendant touched her inappropriately. When T.K. asked K.M. if anything happened to her, she denied it but told T.K. she believed her. K.M. did not feel comfortable telling T.K. the truth because she was not ready, and defendant had told her they would get in trouble if caught.

Around 2021, K.M. reached out to the district attorney after she learned T.M. was subpoenaed by defendant to testify. K.M. disclosed defendant's conduct to T.M. at that time because she wanted T.M. to hear it from her first. She did not want her mother to testify for defendant because "he's a monster."

### E. Police Investigation

Tehachapi Police Officer Mark Machanic took over the investigation into defendant from Officer Barajas in approximately early 2017. Machanic reviewed I.C.'s

forensic interview and spoke with her parents. Machanic asked J.C. why he did not believe I.C. J.C. was unsure if he should believe her because she had a habit of lying and mixed up some of the locations and times. He confirmed I.C. could have been confused based on her age and the time period. S.C. and J.C. told Machanic it was possible defendant went into I.C.'s bedroom without their knowledge. They often rearranged their furniture in the living room with a couch sometimes facing the hall and sometimes not.

Machanic found the 2009 police report about the incident with J.R. He discovered the investigating officer, Graff, wrote a "basic report" and then forwarded it to investigations with no follow-up. Machanic interviewed J.R. and her mother, L.C., about the incident. J.R. provided Machanic with details that differed from Graff's report. When confronted about the differences, J.R. told Machanic the statement in Graff's report was completely wrong.

Machanic also contacted T.M. When asked about her initial statement about the 2009 incident in Graff's report, T.M. told Machanic her statement was completely wrong. K.M. had told T.M. about T.K.'s report to her of defendant's molestation and T.M. relayed this allegation to Machanic. Machanic contacted K.M. who indicated she never had any problem with defendant, but T.K. might have.

Based on K.M.'s disclosure, Machanic interviewed T.K. T.K. disclosed defendant's abuse and told Machanic she had also disclosed the abuse to her stepfather, M.P. She identified defendant in a six-pack photo lineup. When Machanic spoke with M.P. in 2017, M.P. admitted he and T.K.'s mother, K.J., were alcoholics and used drugs when T.K. was a child, and he may not recall if she talked to him about defendant. He disclosed to Machanic the pool incident he found inappropriate.

A search warrant to seize defendant's electronic devices was issued and two cell phones, an external hard drive, a tablet, and a laptop were searched. There was adult pornography on the hard drive, but no child pornography was found on the devices.

## II. Defense Evidence

### A. K.K.'s Testimony

K.K. was married to defendant for 13 years from 1990 to 2003. They had a daughter, A.S., born in 1992. Defendant and his ex-wife remained friends after their divorce.

A.S. had friends come around the house while she was growing up. K.K. never saw defendant act inappropriately with any of the girls that were around the house. He played with the kids but never acted strange. K.K. knew K.M. and never saw anything unusual or untoward between defendant and K.M. She never saw anything during the years she lived with defendant that would give her concerns he would molest children.

### B. K.J.'s Testimony

K.J. did not want to testify and would not have but for a court order. She and T.K. do not speak, and K.J. did not want her testifying to affect her future relationship with her daughter.

K.J. and defendant were best friends for 15 years and spent a lot of time together during that period. She never saw defendant act inappropriately toward her daughter, T.K., or any other kids. According to K.J., T.K. loved defendant and would jump all over him like a jungle gym.

K.J. did not think defendant had an opportunity to be alone with T.K. in her home. She denied she or her husband, M.P., were drinking or using drugs during the time she hung out with defendant.

Defendant played with and threw T.K. in the pool. K.J. disputed M.P.'s story that he voiced concern about the way defendant was touching T.K. in the pool.

### C. A.S.'s Testimony

Defendant's daughter, A.S., testified. She lived with her parents until they separated when she was 11 or 12 years old. After that, A.S. lived with defendant on and off. While growing up, A.S. had friends over all the time. She never saw defendant act

11.

inappropriately with any of her female friends and none of her friends ever told her defendant had acted inappropriately with them.

A.S. knew K.M., J.R., and T.K. She was friends with K.M. while growing up and never saw anything inappropriate between defendant and K.M. A.S. never saw K.M. act like she did not want to be around defendant. She also did not see J.R. or T.K. do anything that indicated they did not want to be around him. None of the three girls ever said anything to A.S. about being uncomfortable around defendant.

### D. Defendant's Testimony

Defendant testified on his own behalf. He denied ever touching the four victims' breasts or vaginas or otherwise massaging or touching any of them in a sexual manner. Defendant also denied showing J.R. a video of him masturbating.

Defendant denied ever having pornography on his cell phone or child pornography on any of his devices. He testified the hard drive with pornography on it found in his car when he was arrested belonged to a friend.

## DISCUSSION

### I.  Prosecutor's Rebuttal Argument

Defendant contends the prosecutor committed misconduct during rebuttal argument by vouching for her witnesses, implying she would never have charged defendant if he was not guilty, and insinuating defense counsel knew she only called truthful witnesses. He claims the prosecutor's misconduct enabled her to exploit her role as an esteemed public servant to gain an unfair advantage at trial and doing so deprived defendant of his due process right to a fair trial.

### A.  Additional Background

During closing argument, defense counsel discussed confirmatory bias, which he described as paying attention to things that confirm an original conclusion and ignore things that make it look like these might be false allegations. He stated he and the prosecutor "get along very well," and he respects "her as a professional." Defense

counsel also stated he respects Officer Machanic as a professional. Counsel then argued that sometimes the prosecution does things in a zeal for a conviction that "might eventually be responsible for an innocent man having the game over button pushed on his life." While discussing Machanic's testimony, defense counsel stated: "You're trying to win your case. You're trying to get the result that you think is justified by what you know. So when you say things are what they are, sometimes things aren't what they are because you're trying to convict somebody." He later stated, "[w]e talk about their desire to convict somebody no matter what." Counsel then discussed the prosecutor's argument defendant targeted the victims because they were troubled kids: "So when you start saying things like that, you're not saying, hey, let's look at the evidence and see what it really shows." For much of his closing argument, counsel discussed the witnesses' testimony, and particularly the victims' testimony, to argue the victims could not be trusted.

> The prosecutor began her rebuttal argument in relevant part:
>
> "Ladies and gentlemen, I can tell you this. The prosecutor who [defense counsel] described to you. The prosecutor who is only looking for a conviction and is so hell bent on getting one that they don't look at all sides and they don't objectively evaluate each and every witness that they put on the stand to make determinations as to whether or not what they say on that stand is perjury, that prosecutor is unethical and is a horrific individual. And I guarantee you that if that were me, [defense counsel] and I would not have the professional relationship and friendship that he got up here and tried to describe to you. No prosecutor's goal should be a conviction. Prosecution is about justice."

Defense counsel did not object to this argument. The prosecutor continued by stating the jury's "job in this case is to look at those four women and what they told you and evaluate who that human being sitting across from you is." The prosecutor noted defense counsel "has all the same evidence that I do." She then responded in detail to defense counsel's arguments about the witnesses and allegations the victims were lying. The prosecutor concluded with: "Ladies and gentlemen, again, I'm asking you to uphold your

13.

oath.  Him or [the victims]?  That's what it is.  Either he's telling the truth or they are.  Tell him you know they are telling the truth.  Tell him you believe these women."

## B.  Applicable Law

"A prosecutor's conduct violates the federal Constitution when it ' "so infect[s] the trial with unfairness as to make the resulting conviction a denial of due process." ' [Citation.]  'Conduct that does not render a trial fundamentally unfair is error under state law only when it involves " ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " ' [Citations.]  When a misconduct claim 'focuses on the prosecutor's comments to the jury, we determine whether there was a reasonable likelihood that the jury construed or applied any of the remarks in an objectionable fashion.' " (*People v. Nadey* (2024) 16 Cal.5th 102, 156.)

" ' "[A] prosecutor is given wide latitude to vigorously argue his or her case" ' [citation] and ' "may make 'assurances regarding the apparent honesty or reliability of' a witness 'based on the "facts of [the] record and the inferences reasonably drawn therefrom." ' " ' [Citation.]  'Improper vouching occurs when the prosecutor either (1) suggests that evidence not available to the jury supports the argument, or (2) invokes his or her personal prestige or depth of experience, or the prestige or reputation of the office, in support of the argument.' " (*People v. Rodriguez* (2020) 9 Cal.5th 474, 480.)  Similarly, "it is misconduct for a prosecutor to express a personal belief in the defendant's guilt if there is a substantial danger that the jurors will construe the statement as meaning that the belief is based on information or evidence outside the trial record." (*People v. Mayfield* (1997) 14 Cal.4th 668, 781–782.)  "The vice of such remarks is that they 'may be understood by jurors to permit them to avoid independently assessing witness credibility and to rely on the government's view of the evidence.' " (*People v. Bonilla* (2007) 41 Cal.4th 313, 336.)

"To preserve a prosecutorial misconduct claim for appeal, a defendant must ordinarily make 'a timely and specific objection at trial' and request an admonition that

the jury disregard the improper argument. [Citations.] ' " 'The reason for this rule, of course, is that "the trial court should be given an opportunity to correct the abuse and thus, if possible, prevent by suitable instructions the harmful effect upon the minds of the jury." ' " ' [Citation.] Failure to raise a timely objection and request an admonition will be excused only ' "if doing either would have been futile, or if an admonition would not have cured the harm." ' [Citation.] However, ' "[a] defendant claiming that one of these exceptions applies must find support for his or her claim in the record. [Citation.] The ritual incantation that an exception applies is not enough." ' " (*People v. Nadey*, *supra*, 16 Cal.5th at p. 185.)

### C. Analysis

The Attorney General argues defendant's failure to object to the prosecutor's rebuttal argument forfeits his prosecutorial misconduct claim. Defendant acknowledges a failure to object results in forfeiture but argues this court should exercise its discretion to address the merits of his claim because the prosecutor's statements amount to flagrant misconduct.

We are not persuaded an objection and request for admonition to the jury would have been futile. Defense counsel objected several times during the prosecutor's closing and rebuttal arguments, and the trial court responded by repeatedly reminding the jury they are the ultimate factfinders, and their determination must be based on the evidence presented at trial. Nothing in the record indicates the court would not have given a similar admonition had defendant objected to the portion of the prosecutor's rebuttal argument he now complains of on appeal.

Nor are we persuaded the prosecutor's argument was so prejudicial that an admonition could not have remedied any harm. (*People v. Cudjo* (1993) 6 Cal.4th 585, 624 [a prosecutor's argument may be "so prejudicial that an admonition by the trial court could not have cured the harm"].) Her comments are not plausibly characterized as flagrant misconduct as defendant asserts. Accordingly, an objection and a request for

15.

admonition would have allowed "the trial court to remedy any unfairness occasioned by the prosecutor's argument, avoiding any potential harm." (*People v. Boyette* (2002) 29 Cal.4th 381, 432.) Even assuming the prosecutor's comments were improper, they were not compounded by other instances of misconduct, unlike the cases cited by defendant wherein the prosecutor engaged in pervasive misconduct or made arguments about witnesses that rendered the trial fundamentally unfair. (See *People v. Conover* (1966) 243 Cal.App.2d 38, 44–53 [misconduct claim cognizable on appeal where there were several instances of prosecutorial misconduct including accusing a defense witness of perjury, expressing a personal belief in that witness's unreliability, and twice expressing a personal belief in the defendant's guilt]; *People v. Alverson* (1964) 60 Cal.2d 803, 805–807 [the prosecution asked the jury to acquit one defendant based on his personal belief in that defendant's testimony and to convict the other two defendants]; *People v. Kirkes* (1952) 39 Cal.2d 719, 722–725 [the prosecutor in closing argument cited his long career as a district attorney, expressed a personal belief in the defendant's guilt, and insinuated he would not have prosecuted if not for evidence outside the record].) Because there was no objection to the prosecutor's argument, defendant forfeited his prosecutorial misconduct claim.

Recognizing his prosecutorial misconduct claim was forfeited, defendant claims he received ineffective assistance of counsel due to counsel's failure to object. To prevail on his ineffective assistance of counsel claim, defendant must show: (1) counsel's representation fell below an objective standard of reasonableness under prevailing professional norms; and (2) a reasonable probability that, but for counsel's deficient performance, the outcome would have been different. (*People v. Hoyt* (2020) 8 Cal.5th 892, 958.) "To make out an ineffective assistance claim on the basis of the trial record, the defendant must show '(1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation.' "

(*Ibid*.) "[E]xcept in those rare instances where there is no conceivable tactical purpose for counsel's actions, claims of ineffective assistance of counsel should be raised on habeas corpus, not on direct appeal. [Citation.] This is particularly true where, as here, the alleged incompetence stems from counsel's failure to object. '[D]eciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance.' " (*People v. Lopez* (2008) 42 Cal.4th 960, 972.)

The record does not reflect why defense counsel did not object to the prosecutor's argument. Presumably he did not because the prosecutor did not vouch for the credibility of the witnesses, express a personal belief in defendant's guilt, or infer evidence outside the record supported the victims' testimony. Her argument is reasonably understood as asserting she was unlike the type of prosecutor described by defense counsel during his closing argument. This was fair commentary in response to defense counsel's insinuation the prosecution did not objectively evaluate the veracity of her victims' accusations because she was driven by an overly zealous desire to obtain a conviction. (*People v. Redd* (2010) 48 Cal.4th 691, 735 [the prosecutor has wide latitude in commenting on deficiencies in defense counsel's tactics and factual account]; cf., *People v. Alvarado* (2006) 141 Cal.App.4th 1577, 1585–1586 [the prosecutor did not respond to counsel's argument and invited the jury to convict based on her opinion of the defendant's guilt and the prestige of her office].)

It was also permissible for the prosecution to address defense counsel's arguments that the victims were lying. "When defense counsel argues that a witness has lied, the prosecutor is permitted to respond. The prosecutor ' "may make 'assurances regarding the apparent honesty or reliability of' a witness 'based on the "facts of [the] record and the inferences reasonably drawn therefrom." ' " ' " (*People v. Rodriguez*, *supra*, 9 Cal.5th at p. 483.) A prosecutor's response to arguments about a witness lying crosses the line if the prosecutor references evidence or other matters outside the record. (*Ibid*.) But the prosecutor here expressly stated in her response that defense counsel has all the

17.

same evidence she does, and she did not claim or infer the victims were credible based on evidence outside the record. She accurately acknowledged it was for the jury to decide whose testimony to believe in a case that amounted to a credibility contest. Because the prosecutor's comments were not misconduct, defense counsel's performance was not deficient for failing to object.

The record also does not show a reasonable probability of a different outcome if defense counsel had objected to the prosecutor's rebuttal argument. The prosecution presented testimony from four victims describing similar conduct by defendant. There was no evidence the victims had a motive to lie or exaggerate their testimony. (See e.g., *People v. Jimenez* (2019) 35 Cal.App.5th 373, 386 [no prejudicial prosecutorial misconduct where three victims had similar descriptions of molestation and no motive to lie].) Additionally, the trial court instructed the jury to use only the evidence presented in the courtroom and that nothing the attorneys say is evidence (CALCRIM No. 104). The jury was further instructed they "alone must judge the credibility or believability of the witnesses" by CALCRIM No. 226. We presume the jury treated the court's instructions as statements of law and the prosecutor's argument as words spoken by an advocate meant to persuade. (*People v. Morales* (2001) 25 Cal.4th 34, 47.)

In conclusion, defendant's prosecutorial misconduct claim was forfeited, and his related ineffective assistance of counsel claim is without merit.

## II. Ex Post Facto Claim

The parties agree the 25 years to life sentences on counts 2, 3, and 4 violate constitutional prohibitions on ex post facto laws because section 667.61, subdivision (j)(2) did not take effect until 2010 and the prescribed sentence at the time of those counts was only 15 years to life (§ 667.61, subd. (b)).

### A. Additional Background

The amended information alleged the following dates regarding each count:

Count 1 (I.C.):  June 27, 2011 to June 27, 2013

Count 2 (J.R.):  January 1, 2009 to December 31, 2009

Count 3 (T.K.):  August 23, 2007 to August 23, 2010

Count 4 (K.M.):  November 9, 2004 to November 8, 2010

The jury instructions gave these date ranges for the corresponding counts and stated:  "[t]he People are not required to prove that the crimes took place exactly on those days but only that they happened reasonably close to those days."  The verdict forms generally stated defendant had been found guilty of violating section 288, subdivision (a) without reference to any dates.

### B.  Applicable Law

Enacted in 1994, the One Strike law sets forth an alternative, harsher sentencing scheme for certain sex crimes.  (*People v. Mancebo* (2002) 27 Cal.4th 735, 741 (*Mancebo*).)  The One Strike law "mandates an indeterminate sentence of 15 or 25 years to life in prison when the jury has convicted the defendant of a specified felony sex crime (§ 667.61 [listing applicable crimes]) and has also found certain factual allegations to be true (§ 667.61, subds. (d), (e))."  (*People v. Anderson* (2009) 47 Cal.4th 92, 102.)  At all relevant times, a violation of section 288, subdivision (a) has been a One Strike offense enumerated in section 667.61, subdivision (c), and section 667.61, subdivision (e) has included a multiple victim circumstance (§ 667.61, subd. (e)(4), former subd. (e)(5)).

In 2010, the Legislature made several amendments to the One Strike law, which took effect on September 9, 2010.  (Stats. 2010, ch. 219, § 16.)  Among the amendments, subdivision (j)(2) was added to section 667.61 to provide an increased sentence of 25 years to life for a defendant "convicted of an offense specified in subdivision (c) under one of the circumstances specified in subdivision (e), upon a victim who is a child under 14 years of age."  Before September 9, 2010, a defendant convicted of violating section

19.

288, subdivision (a) with a true finding on only the multiple victim circumstance[3] was subject to a mandatory sentence of 15 years to life. (Stats. 2006, ch. 337, § 33; § 667.61, subd. (b); *People v. Wutzke* (2002) 28 Cal.4th 923, 931.)

The federal and state constitutions proscribe ex post facto laws. (U.S. Const., art. I, § 10; Cal. Const., art. I, § 9.) Both constitutions prohibit legislatures from retroactively increasing the punishment for a crime. (*Collins v. Youngblood* (1990) 497 U.S. 37, 42–43; *People v. Grant* (1999) 20 Cal.4th 150, 158.) The federal and state ex post facto laws are interpreted the same way. (*People v. Snook* (1997) 16 Cal.4th 1210, 1220.)

Ex post facto principles have been applied to the One Strike law and its amendments. (E.g., *People v. Canales* (2024) 106 Cal.App.5th 1230, 1259–1260 [continuous sexual abuse under § 288.5 was not a One Strike crime at the time of the offense and barred the multiple victim circumstance from increasing the defendant's sentence]; *People v. Hiscox* (2006) 136 Cal.App.4th 253, 257–262 (*Hiscox*) [applying ex post facto clause where alleged offenses occurred during period straddling when the One Strike law became effective]; *People v. Riskin* (2006) 143 Cal.App.4th 234, 244–245 [same].) Where the ex post facto clauses apply, "it is the prosecution's responsibility to prove to the jury that the charged offenses occurred on or after the effective date of the statute providing for the defendant's punishment. When the evidence at trial does not establish that fact, the defendant is entitled to be sentenced under the formerly applicable statutes even if he raised no objection in the trial court." (*Hiscox*, at p. 256.) An unauthorized sentence may also be corrected on appeal despite the absence of an objection below. (*People v. Scott* (1994) 9 Cal.4th 331, 354.) A sentence is unauthorized if "it could not lawfully be imposed under any circumstance in the particular

---

[3]    As part of the amendments in 2010, the multiple victim circumstance was also moved from section 667.61, subdivision (e)(5) to subdivision (e)(4) where it still resides. (Stats. 2010, ch. 219, § 16.)

case." (*Ibid*.)

### C. Analysis

Count 1 alleged the lewd act against I.C. occurred during a timeframe after September 9, 2010. There is no dispute the period for this count was after subdivision (j)(2) was added to section 667.61 and therefore, ex post facto principles are not implicated for count 1. We turn then to whether the trial record shows the offenses in counts 2, 3, and 4 occurred after subdivision (j)(2) took effect. (*Hiscox*, *supra*, 136 Cal.App.4th at p. 259 [ex post facto claim must be resolved based on the trial record].)

The amended information alleged counts 2 and 3 occurred before September 9, 2010. Count 2 alleged a lewd act against J.R. some time in 2009. Both J.R. and her mother, L.C., testified the sleepover during which defendant molested J.R. was in 2009. For count 3 involving T.K., the timeframe was alleged as between August 23, 2007, and August 23, 2010. T.K. was uncertain when defendant started and stopped molesting her. She testified the touching was "[m]ost likely" going on when she was eight years old and went on for years. The incidents happened approximately when she was eight, nine or 10 years old. In terms of when it stopped, T.K. testified it "was very blurry but it could have been sixth, seventh, or eighth grade." She agreed all the touching occurred before she turned 14 years old. This means defendant's molestation of T.K. occurred at the latest before August 2012.

The timeframe for count 4 alleged in the amended information—November 9, 2004 to November 8, 2010—straddles the effective date of section 667.61, subdivision (j)(2). K.M. testified defendant molested her while dating her mother and they stopped dating when she was 11 years old. She confirmed the incidents with defendant all occurred before she was 12. Defendant's molestation of K.M. therefore occurred at the latest before November 2010, approximately two months after subdivision (j)(2) became effective. But no evidence was presented that any of the touching specifically occurred during this two-month timeframe between September and November 2010.

The jury was not asked to make findings on the specific dates the offenses occurred, and the verdict forms do not specify the dates of the offenses. Nor does the trial record establish beyond a reasonable doubt that the offenses in counts 2, 3, and 4 occurred after September 9, 2010. While the record contains inferences the offenses in counts 3 and 4 *may have* occurred after that date, "[i]t would be inappropriate for us to review the record and select among acts that occurred before and after that date, or to infer that certain acts probably occurred after that date. … For a court to hypothesize which acts the jury may have based its verdicts on, or what dates might be attached to certain acts based on ambiguous evidence, would amount to 'judicial impingement upon the traditional role of the jury.' " (*Hiscox*, *supra*, 136 Cal.App.4th at p. 261.) On this state of evidence, we cannot conclude the offenses in these counts undoubtedly occurred after September 9, 2010. The parties agree, as do we, the evidence does not establish beyond a reasonable doubt that the offenses in counts 2, 3, and 4 took place after September 9, 2010, the effective date of section 667.61, subdivision (j)(2). Defendant's sentences on those counts must therefore be reversed.

Defendant contends the trial court must be ordered to reduce the sentence on counts 2, 3, and 4 to a term of 15 years to life on each count. The Attorney General submits the matter should be remanded for defendant to be resentenced on these counts. When part of a sentence is stricken on review, a remand and full resentencing is generally appropriate so the trial court can exercise its sentencing discretion following the changed circumstances. (*People v. Buycks* (2018) 5 Cal.5th 857, 893.) However, when the trial court imposes the maximum possible sentence, there is no need to remand the matter for resentencing. (*Id.* at p. 896, fn. 15; accord *People v. Lopez* (2019) 42 Cal.App.5th 337, 342.) Where there are no sentencing choices to restructure, it is appropriate to modify the sentence on appeal. (*People v. Francis* (2017) 16 Cal.App.5th 876, 887; § 1260.)

Here, the trial court imposed the maximum possible sentence. The court's comments at the sentencing hearing reflect the court understood it had discretion to

impose concurrent or consecutive sentences for defendant's convictions and chose to impose consecutive sentences.[4]  The court further stated the aggravating circumstances would justify an upper term.  Accordingly, there is no need to remand for resentencing. We will direct the trial court to modify the abstract of judgment to reflect the sentences imposed on counts 2, 3, and 4 are reduced to 15 years to life on each count.

## III.    Amendment of Information

Defendant argues the trial court violated his due process rights by allowing the prosecutor to amend the information at the close of evidence to add an allegation that triggered a sentence of 25 years to life pursuant to section 667.61, subdivision (j)(2).  He contends his sentence must be stricken and the matter remanded with instructions to impose four terms of 15 years to life.  The Attorney General responds that the amendment did not prejudice defendant's trial strategy in any way and the prosecution moved to amend in response to *In re Vaquera* (2024) 15 Cal.5th 706, rather than to gain an advantage at sentencing.

We have already concluded application of section 667.61, subdivision (j)(2) to counts 2, 3, and 4 is barred by ex post facto laws.  We therefore limit our analysis to the prosecution's amendment of the information to allow a sentence of 25 years to life on count 1.

---

[4]     "The one strike law includes a provision requiring consecutive sentences for some, but not all, of the offenses listed in section 667.61, subdivision (c)." (*People v. Lopez* (2022) 76 Cal.App.5th 287, 291; § 667.61, subd. (i).)  A lewd or lascivious act (§ 288, subd. (a)), the only crime for which defendant was convicted, is identified in subdivision (c)(8) of section 667.61 and therefore, defendant's convictions do not implicate the mandatory sentencing provision in section 667.61, subdivision (i).  By implication, section 667.61, subdivision (i) "leaves the decision to impose consecutive or concurrent terms" on the nonspecified offenses "to the sentencing court's discretion under section 669." (*People v. Valdez* (2011) 193 Cal.App.4th 1515, 1524.)

### A.  Additional Background

The original complaint filed in 2017 charged defendant with three counts of committing a lewd or lascivious act on a child under 14 years of age (§ 288, subd. (a)). These counts involved I.C., J.R., and T.K.  The complaint did not include a One Strike allegation under section 667.61.

During a hearing on January 16, 2018, defense counsel represented to the trial court that the prosecution had offered a plea deal of eight years.  Defendant rejected that offer.

The preliminary hearing was held on February 1, 2018.  Toward the end of the hearing, the trial court allowed the prosecution to add a multiple victim circumstance allegation under the One Strike law (§ 667.61, subds. (c), (e)(4), former subd. (e)(5)) to all three counts.  On February 6, 2018, the prosecutor filed an information with the three counts and multiple victim circumstance alleged on each count.

A separate information was filed in early 2022 regarding K.M.  Defendant's two cases were consolidated.  The prosecutor filed an amended information on April 12, 2022, that included all four counts for the four victims and the multiple victim circumstance on all counts.

In early 2024, defense counsel filed a motion wherein he indicated defendant's sentencing exposure was 37 years to life in prison.  Counsel reiterated this potential exposure in two subsequent pleadings.

The prosecutor filed an amended information on April 16, 2024, adding aggravating factors to all four counts.  The prosecution began presenting its case to the jury that day.

On April 22, 2024, both sides rested.  The prosecutor then moved to amend the information:

> "I am requesting to file an amended felony [i]nformation.  The basis of that
> is that I recently learned after doing further research that there's no longer a

24.

split of authority in the courts regarding whether or not the People have to allege the enhancement under 667.61(j)(2) in order to obtain the 25-to-life sentence. [¶] There was previously a split as to whether or not that had to be alleged. It's my understanding a case has recently come down indicating that if the D.A.'s office is seeking the 25-to-life sentence for any of the 667.61 strike enhancements we are to allege the (j)(2) section that was previously not done, as there was a split of authority. [¶] I am requesting to amend to add that section. I have had several conversations with [defense counsel] in our negotiations or -- hard to call them negotiations -- but at least in discussing the number of years that [defendant] is facing. And I know that he was under the impression, as was I, that each count in this case would be 25-to-life for each separate victim. That is the D.A.'s intention and because of that I am requesting to file this amended felony [i]nformation that includes the (j)(2) enhancement, as well as what has previously been amended in this case.

"[DEFENSE COUNSEL]: With apologies to [the prosecutor], I don't specifically remember our discussions about 25 to life as to each victim. And as the Court knows, when I filed the declaration for payment of transcripts, I wrote in there that I believed it was at least 37-to-life and that was a calculation that began at 15-to-life and then added determinate counts on top of that consecutive for the other ones. [¶] So we may very well have had the discussions. In this case I have not been focused on what the maximum exposure is. Obviously it's functionally life, forever. So we may very well have had the conversation. I just don't recall about whether it being 25-to-life. [¶] I will object to the amendment at this point but I will submit on that objection."

The trial court granted the prosecutor's motion to amend the information. The court stated: "The initial charges to this case with the multiple victim enhancement pursuant to Penal Code Section 667.61 based on the substantive charge qualifying under subsection C does enable a sentence of 25-years-to-life per count if the conduct enhancement pursuant to multiple victims alleged is found true by the jury. [¶] Subsection J, sub[division] two, merely articulates the sentencing scheme that would be utilized as an alternative sentencing scheme." The court accepted the prosecutor's representation that the amendment was being made based on a recent change in the law. The court found the amendment would not have changed defendant's trial strategies or

25.

tactics, and did not involve new evidence. The prosecutor filed a written information reflecting this amendment on April 24, 2024.[5]

The jury reached a verdict on April 24, 2024. The verdict form for the multiple victim circumstance allegation on count 1 stated the jury found true that defendant "has been convicted in the present case of committing an offense specified in Section 667.61(C) of the [P]enal [C]ode against more than one victim, within the meaning of Penal Code section 667.61(E)(4), as alleged in the first count of the Information."

At sentencing, the trial court stated the prosecutor's amendment to add an allegation under section 667.61, subdivision (j)(2) "put Court and Counsel on notice that if there was a conviction and a true finding to the multiple victims' enhancement, based on the evidence presented to this jury the defendant would qualify for sentencing pursuant to that code section as an alternative sentencing scheme. [¶] One strikes does [*sic*] include an alternative sentencing scheme regardless, but as it relates to Penal Code Section 667.61, based on the convictions suffered by the defendant, the Court is mandated to follow that requirement and sentence the defendant accordingly."

**B. Mandatory Sentence Under Section 667.61, Subdivision (j)(2)**

Section 667.61, subdivision (b) states: "Except as provided in subdivision (a), (j), (*l*), or (m), a person who is convicted of an offense specified in subdivision (c) under one of the circumstances specified in subdivision (e) shall be punished by imprisonment in the state prison for 15 years to life." "A lewd act (§ 288, subd. (a)) is a qualifying offense under subdivision (c)(8) of section 667.61. One of the circumstances specified in subdivision (e) is that the defendant is convicted of committing a lewd act against more

---

[5]     Following off-the-record discussions about jury instructions, the prosecutor further amended the information to change the offense on count 4 from continuous sexual abuse (§ 288.5, subd. (a)) to a fourth count of committing a lewd or lascivious act on a child under 14 years of age (§ 288, subd. (a)). Defendant did not object to this amendment. This change was reflected in the amended information filed on April 24, 2024.

than one victim. (§ 667.61, subd. (e)(4).) Thus, a defendant convicted of lewd acts against two victims must be imprisoned for 15 years to life. (*Id.*, subds. (b), (c)(8), (e)(4).)" (*People v. Nash* (2023) 87 Cal.App.5th 483, 491.)

"Section 667.61, subdivision (b) contains a carveout, however, for circumstances that subject a defendant to a greater mandatory prison term of 25 years to life. One of those is specified in subdivision (j)(2) and applies to '[a] person who is convicted of an offense specified in subdivision (c) under one of the circumstances specified in subdivision (e), upon a victim who is a child under 14 years of age.' " (*People v. Nash*, *supra*, 87 Cal.App.5th at pp. 491–492.) As relevant here, a defendant convicted of a lewd act (§ 288, subd. (a)) upon a victim under the age of 14 with a true finding on a multiple victim circumstance (§ 667.61, subd. (e)(4)) is subject to a mandatory sentence of 25 years to life pursuant to section 667.61, subdivision (j)(2). (See *Vaquera*, *supra*, 15 Cal.5th at p. 723 [provisions of the One Strike law including § 667.61, subd. (j)(2) are generally mandatory when pled and proved].)

Defendant does not dispute his conviction for a lewd act against a victim under 14 years old with a true finding on a multiple victim circumstance is subject to a sentence of 25 years to life under section 667.61, subdivision (j)(2). He argues however that due process entitled him to timely notice of the prosecution's intent to seek a 25 years to life sentence on all counts. Because defendant relies heavily on *Mancebo*, *People v. Anderson* (2020) 9 Cal.5th 946 (*Anderson*), and *Vaquera*, we discuss these cases in detail.

### C. *Mancebo*, *Anderson*, and *Vaquera*

The purpose of an accusatory pleading is to provide the defendant with reasonable notice of the charges. (*People v. Sandoval* (2006) 140 Cal.App.4th 111, 132.) "In the sentencing enhancement context, the touchstone of fair notice is whether the accusatory pleading enables the defense to predict the sentence the defendant faces if convicted." (*Vaquera*, *supra*, 15 Cal.5th at p. 717.)

27.

In this vein, our Supreme Court in *Mancebo* held that a defendant has a "due process right to fair notice of the specific sentence enhancement allegations that will be invoked to increase punishment for his crimes." (*Mancebo*, *supra*, 27 Cal.4th at p. 747.) In the context of the One Strike law, a defendant must have "fair notice of the qualifying statutory circumstance or circumstances that are being pled, proved, and invoked in support of One Strike sentencing." (*Mancebo*, at p. 754.) In *Mancebo*, the trial court sentenced the defendant under the One Strike law by relying on the multiple victim circumstance although the information did not allege and had never been amended to include a multiple victim allegation. (*Mancebo*, at pp. 738–739.) The Supreme Court acknowledged "where a defendant is charged with and convicted of qualifying sex crimes against two or more victims, it may be difficult to meaningfully contest the truth of a multiple victim qualifying circumstance," but concluded the defendant's One Strike sentence based on that circumstance violated due process and the express pleading and proof requirements of the One Strike law. (*Mancebo*, at p. 752.[6]) The court emphasized the specific numerical subdivision of the qualifying One Strike circumstance need not necessarily be pled. (*Mancebo*, at p. 753.) But a defendant must have "fair notice of the qualifying statutory circumstance or circumstances that are being pled, proved, and invoked in support of One Strike sentencing." (*Id.* at p. 754.) Adequate notice can be conveyed by reference to the description of the qualifying circumstance in conjunction with a general reference to section 667.61 or a more specific reference to the numerical subdivision of section 667.61. (*Mancebo*, at p. 754.)

---

[6] The One Strike law contains express pleading and proof requirements. Specifically, section 667.61, subdivision (f) states the qualifying circumstances must "have been pled and proved." Section 667.61, subdivision (o) further provides: "The penalties provided in this section shall apply only if the existence of any circumstance specified in subdivision (d) or (e) is alleged in the accusatory pleading pursuant to this section, and is either admitted by the defendant in open court or found to be true by the trier of fact."

In *Anderson*, the prosecutor requested after the close of evidence that the jury be instructed on a vicarious firearm enhancement of 25 years to life (§ 12022.53, subd. (e)) in connection with five robbery counts although that enhancement had not been pled in the operative information on those counts. (*Anderson*, *supra*, 9 Cal.5th at p. 951.)  The jury found the firearm enhancement to be true and defendant's sentence included the enhancement on all five robbery counts. (*Id.* at pp. 951–952.)  The Supreme Court concluded the information violated the relevant statutory pleading requirements and did not comport with due process because it failed to inform the defendant of his exposure to five additional 25 years to life enhancements in connection with the robbery counts. (*Id.* at p. 957.)  In reaching its conclusion, the court reiterated its prior holdings that due process does not require "rigid code pleading or the incantation of magic words.  But the accusatory pleading must adequately inform the defendant as to how the prosecution will seek to exercise its discretion." (*Ibid.*)  Under *Mancebo*, "the purpose of a statutory pleading requirement is not simply to ensure the defendant has notice of the potential sentence on the day of sentencing.  It is meant to give sufficient notice to permit the defense to make informed decisions about the case, including whether to plead guilty, how to allocate investigatory resources, and what strategy to deploy at trial." (*Anderson*, at p. 964.)  Because the prosecutor's intention to seek the additional enhancements on the five robbery counts did not become clear until the sentencing hearing, the defendant did not receive adequate notice of his potential sentence. (*Ibid.*)

In *Vaquera,* the Supreme Court revisited the required notice for sentencing under the One Strike law.  As in this case, the defendant in *Vaquera* was convicted of a lewd act on a child under the age of 14 with a true finding on the multiple victim circumstance.  The information alleged the multiple victim circumstance but did not cite section 667.61, subdivision (j)(2) or specify the victim was under 14 years old. (*Vaquera*, *supra*, 15 Cal.5th at pp. 714–715.)  The prosecutor initially filed a sentencing brief seeking a term of 15 years to life but subsequently filed another sentencing brief seeking a term of 25

years to life pursuant to section 667.61, subdivision (j)(2), which the trial court imposed. (*Vaquera*, at p. 715.) The *Vaquera* court granted review to resolve a split of authority on whether a charging document that references section 667.61, subdivision (b) puts a defendant on notice of exposure to a term of 25 years to life under section 667.61, subdivision (j)(2). (*Vaquera*, at p. 716; see *People v. Jimenez*, *supra*, 35 Cal.App.5th at pp. 395–397 [sentence under § 667.61, subd. (j)(2) was unauthorized where it was not pled in the information and first raised by the prosecution in a sentencing memorandum]; cf., *In re Vaquera* (2019) 39 Cal.App.5th 233, 239–243, review granted Nov. 26, 2019, S258376 [disagreeing with *Jimenez* and finding the defendant was on notice of exposure to a 25 year sentence because the information alleged multiple victims with qualifying offenses and victims under 14].)

The *Vaquera* court reiterated that "[a]n accusatory pleading need not specify the number of the pertinent sentencing statute, so long as it otherwise clearly notifies the accused of the factual basis on which it is seeking a longer sentence and the information necessary to calculate sentencing exposure." (*Vaquera*, *supra*, 15 Cal.5th at pp. 719–720.) Accordingly, "[t]o satisfy due process, it is sufficient for an accusatory pleading to provide the defendant fair notice of the particular One Strike sentence the prosecution is seeking and of which facts it intends to prove to support that sentence." (*Id.* at p. 720.) In Vaquera's case, the way the prosecutor framed the allegations in the information suggested it was seeking a sentence of 15 years to life based on the multiple victim circumstance and not seeking sentencing under section 667.61, subdivision (j)(2). (*Vaquera*, at pp. 721–722.) The court concluded the prosecutor did not provide fair notice of its intent to rely on the victim's age to seek a sentence of 25 years to life. (*Id.* at pp. 724–725.) Because the defendant did not learn of his sentencing exposure in time to take it into account in fashioning his defense strategy, the defendant was entitled to resentencing. (*Id.* at pp. 726–728.)

**D. Analysis**

Here, defendant argues the ritual act of filing an amended information near the end of trial did not cure the notice problem identified in *Mancebo*, *Anderson*, and *Vaquera*. We disagree. The circumstances in the instant case differ materially from *Mancebo*, *Anderson*, and *Vaquera*. In those cases, the information was never amended to include the factual allegation or statutory subdivision used to impose sentence. Specifically, in *Mancebo*, the trial court at sentencing imposed a gun enhancement (§ 12022.5, subd. (a)) based on its belief it could substitute the unpled multiple victim circumstance for the expressly pleaded gun-use circumstances to satisfy the minimum number of circumstances requirement for One Strike sentencing. (*Mancebo*, *supra*, 27 Cal.4th at pp. 738-739.) In *Anderson*, the prosecution requested imposition of a vicarious firearm discharge enhancement on counts for which it had never been pled. (*Anderson*, *supra*, 9 Cal.5th at p. 951.) And in *Vaquera*, the prosecution's intent to seek an increased sentence under section 667.61, subdivision (j)(2) did not become clear until three months after the jury verdict and just four days before the sentencing hearing. (*Vaquera*, *supra*, 15 Cal.5th at p. 727.) In all three cases, the defendant was not made aware of his sentencing exposure until after the jury reached a verdict and no information pleading the relevant allegation or statute was ever filed.

The notice issues in *Mancebo*, *Anderson*, and *Vaquera* are simply not present here. The prosecution orally requested to amend the information to add reference to section 667.61, subdivision (j)(2) after the close of evidence but before closing arguments and the verdict. The prosecution's intent to invoke this statutory subdivision in sentencing is shown by the parties' discussion regarding the proposed amendment before the trial court. A pleading may be amended informally, including by oral request. (*Anderson*, *supra*, 9 Cal.5th at p. 960 [not every amendment to a pleading need be made in writing]; *People v. Sandoval*, *supra*, 140 Cal.App.4th at p. 133 ["California law does not attach any talismanic significance to the existence of a written information"].) The prosecution

31.

subsequently filed a written information reflecting the amendment by alleging defendant committed the "offense against a child under 14 years, under one or more of the circumstances listed in Penal Code section 667.61(e), within the meaning of Penal Code section 667.61(j)(2)" on all four counts. (Capitalization omitted.) As amended, the information identified the factual circumstances on which the prosecution was relying and expressly cited the One Strike statutory subdivision under which sentence was being sought. This constitutes adequate notice to defendant in accordance with *Vaquera*. (*Vaquera*, *supra*, 15 Cal.5th at p. 725 [outlining various ways the prosecutor may provide fair notice of its intent to seek sentencing under § 667.61, subd. (j)(2)].) The prosecutor's oral amendment request and the written information filed left no doubt the prosecution was exercising its discretion to seek a sentence of 25 years to life on count 1. (Cf. *Vaquera*, at pp. 721–722 [the information's language and statutory citations could have reasonably led defense counsel to believe the prosecution was exercising its discretion not to pursue sentencing under § 667.61, subd. (j)(2)]; *Anderson*, at pp. 951, 957 [the defendant had reason to believe the prosecution would not seek the greater firearm enhancement on the robbery counts because the information alleged other lesser firearm enhancements on those counts].)

The more salient question is whether the trial court abused its discretion by allowing the prosecutor to add section 667.61, subdivision (j)(2) to the information after the close of evidence. According to defendant, notice of the prosecution's intent to seek sentencing under this statutory subdivision came too late in the proceedings for defendant to plan his trial strategy, consider any pretrial plea offer, or if none existed, make a plea offer of his own.

A "defendant's due process rights are not prejudiced by amendment of the information, and the trial court may permit amendment of the accusatory pleading 'at any stage of the proceeding, up to and including the close of trial,' so long as defendant's substantial rights are not prejudiced." (*People v. Fernandez* (2013) 216 Cal.App.4th 540,

32.

554; accord *Anderson*, *supra*, 9 Cal.5th at p. 958; *People v. Arevalo-Iraheta* (2011) 193 Cal.App.4th 1574, 1580–1581; § 1009.) "Section 1009 [however] specifically proscribes amending an information to charge an offense not shown by the evidence taken at the preliminary hearing." (*People v. Winters* (1990) 221 Cal.App.3d 997, 1007.) If the defendant's substantial rights will be prejudiced by the amendment, the trial court may grant a reasonable postponement. (*People v. Goolsby* (2015) 62 Cal.4th 360, 367–368.) "Whether or not to allow an amendment is within the trial court's discretion, and its ruling will not be reversed absent an abuse of discretion." (*People v. Villagren* (1980) 106 Cal.App.3d 720, 724.)

We discern no abuse of discretion by the trial court. Prior to the amendment to the information, the prosecution had long alleged in count 1 that defendant committed a lewd act against a victim under 14 years of age with a multiple victim circumstance. The amendment added the relevant statutory subdivision to expressly reflect the prosecution's intent to pursue a sentence of 25 years to life but did not change the sole charged offense. Though defendant argues his counsel (and presumably defendant himself) believed his sentencing exposure on all counts totaled 37 years to life,[7] he fails to explain how his trial strategy would have differed if he understood his potential sentence was longer. Defense counsel objected to the prosecution's amendment, but did not argue to the trial court the amendment would have changed his trial strategy. Counsel's strategy from the start, as reflected in his opening statement, was that defendant was innocent of the charges, the victims were not credible, and defendant would testify as to his innocence. Counsel presented testimony from character witnesses and engaged a defense investigator who

---

[7] Defendant does not purport to know how defense counsel arrived at this sentencing exposure and offers permutations of how this number could be derived based on counsel's representation this reflected a term of 15 years to life on one count plus determinate sentences on the other counts. The record does not adequately reflect how defense counsel came up with this number.

interviewed percipient witnesses. He declined instructions on any lesser included offenses and used his closing argument to reiterate an innocence defense. Nothing indicates counsel's understanding of defendant's sentencing exposure altered the defense's trial strategy or use of investigative resources. Indeed, counsel admitted when the prosecution amended the information he had "not been focused on what the maximum exposure is" and understood it was "functionally life, forever." Had counsel believed the timeliness of the amendment substantially prejudiced defendant's rights, he could have requested a continuance, but he did not do so.

The record does not support defendant's speculative claim he "might have" initiated settlement discussions had he known he faced a 100 years to life sentence. The only plea negotiations reflected in the record reveal an offer of eight years after the complaint was filed and before any allegations under the One Strike law were made. In April 2024, shortly before trial began, defense counsel told the trial court there had been "no significant negotiations" on a plea deal as the "offer has always included a life tail and [defendant] has indicated he was not interested in negotiating."

We disagree with defendant that the prosecutor offered no compelling justification for not bringing the section 667.61, subdivision (j)(2) allegations earlier. The prosecutor explained the allegation was not pled as there was previously a split of authority on whether it must be expressly pled.[8] The prosecution requested leave to amend to comport with the notice required under *Vaquera* and the trial court accepted the prosecutor's representation the amendment was being made based on a recent change in the law. Given the unsettled nature of the law until *Vaquera*, the court did not act arbitrarily in accepting the prosecutor's representation for why the allegation was not previously pled

---

[8] Both parties on appeal logically surmise the prosecutor was alluding to *Vaquera* when referring to recent case law resolving a split of authority on whether the prosecution must allege an enhancement under section 667.61, subdivision (j)(2).

and the amendment was permissible to reflect how the prosecution was exercising its sentencing discretion.

In conclusion, the trial court did not violate defendant's due process rights or abuse its discretion by allowing the prosecution to amend the information to reference section 667.61, subdivision (j)(2) on count 1.

## DISPOSITION

The judgment is modified to reflect 15 years to life sentences each on counts 2, 3, and 4. The trial court is directed to prepare an amended abstract of judgment reflecting these modifications and forward a certified copy of the amended abstract of judgment to all relevant authorities. In all other respects, and as modified, the judgment is affirmed.


GUERRA, J.[†]

WE CONCUR:


HILL, P. J.


LEVY, J.

---

[†]     Judge of the Fresno Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.